# 12 CIV 4156

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EDWARD CHILDS, Derivatively on Behalf of Himself and All Others Similarly Situated, | Case No. _____ |
| Plaintiff, | |
| vs. | |
| MARK E. ZUCKERBERG, JAMES W. BREYER, PETER A. THIEL, MARC L. ANDREESSEN, ERSKINE B. BOWLES, DONALD E. GRAHAM, and REED HASTINGS, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| Defendants, | |
| -and- | |
| FACEBOOK, INC., | **JURY TRIAL DEMANDED** |
| Nominal Defendant. | |

Plaintiff Edward Childs, by and through his attorneys, brings this action derivatively on behalf of nominal defendant Facebook, Inc. ("Facebook" or the "Company") and alleges upon personal knowledge as to himself and his own acts, and as to all other matters based upon the investigation conducted by his attorneys which included, among other things, a review of Securities and Exchange Commission ("SEC") filings, documents, analyst reports, news reports, press releases, and other publicly available information regarding the Company, as follows:

1.      This is a shareholder derivative action brought on behalf of the Company. The complaint seeks relief against the Facebook Board of Directors (the "Board"), consisting of Defendants Mark E. Zuckerberg, James W. Breyer, Peter A. Thiel, Marc L. Andreessen, Erskine B. Bowles, Donald E. Graham, and Reed Hastings (collectively the "Individual Defendants"), to remedy breaches of their fiduciary duties in connection with the Initial Public Offering ("IPO") of Facebook common stock, which took place on May 18, 2012.

2.      After the IPO occurred, Facebook's stock price dropped precipitously.  On May 22, 2012, it was discovered that Facebook had, shortly before the IPO, selectively and verbally disseminated material information to its underwriters, who in turn verbally disseminated such information to select institutional investors, i.e. that Facebook was lowering previously-announced guidance.  This information was not disseminated publicly to other prospective purchasers in the IPO.   As a result of this news, the stock price plummeted, and Facebook is now subject to various lawsuits and governmental and regulatory investigations, and has suffered significant reputational harm.  The Board breached their fiduciary duties by failing to take steps to prevent this conduct from occurring.  Furthermore, the board cannot be expected to act on Facebook's behalf in a disinterested and independent manner, because, as Columbia law Columbia Law School Professor John Coffee stated, "[p]retending that Facebook will have an independent board . . . is like putting rouge on a corpse."

## JURISDICTION AND VENUE

3.      This Court has jurisdiction pursuant to 28 U.S.C. §1332(a)(2), as plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

4.      Venue is proper in this Court pursuant to Section 27 of the Exchange Act and 28 U.S.C. 1391(a)(1) because: (1) a substantial portion of the transactions and wrongs complained of herein, including the improper dissemination of financial information by Facebook's underwriters and/or institutional investors, occurred within this Judicial District, and (2) Defendants have received substantial compensation by engaging in numerous activities that have had an effect in this Judicial District.

## THE PARTIES

5.      Plaintiff Edward Childs purchased 100 shares of Facebook common stock on the IPO, and has held these shares continuously since the alleged conduct occurred.  Mr. Childs is a resident of Allegheny County, Pennsylvania.

6.     Nominal Defendant Facebook is a social media company that is incorporated in Delaware and headquartered at 601 Willow Road, Menlo Park, California 94025.

7.     Defendant Mark E. Zuckerberg is the Chairman of the Board and Chief Executive Officer of Facebook.  He has been Chief Executive Officer and a Director since July 2004.  Mr. Zuckerberg has served as Chairman of the board of directors since January 2012.   Mr. Zuckerberg is a resident of California.

8.     Defendant James W. Breyer has been a director since April 2005.  Mr. Breyer has been a Partner of Accel Partners, a venture capital firm, since 1987, and currently serves as President of Accel Management Co., Inc.  Mr. Breyer is a resident of California.

9.     Defendant Peter A. Thiel has been a director since April 2005.  Since 2005, Mr. Thiel has been a Partner of Founders Fund, a venture capital firm. Mr. Thiel has also served as President of Clarium Capital Management, LLC, a global macro investment manager, since 2002.  Mr. Thiel is a resident of California.

10.     Defendant Marc L. Andreessen has been a director since June 2008.   Mr. Andreessen is a co-founder and has been a General Partner of Andreessen Horowitz, a venture capital firm, since July 2009.  Mr. Andreessen is a resident of California.

11.     Defendant Erskine B. Bowles has been a director since September 2011.  Mr. Bowles is President Emeritus of the University of North Carolina and served as President from January 2006 through December 2010.  Mr. Bowles has also been a Senior Advisor of BDT Capital Partners, LLC, a private investment firm, since January 2012.   Mr. Bowles currently serves as a member of the boards of directors of Morgan Stanley, Belk, Inc., and Norfolk Southern Corporation. Mr. Bowles is a resident of North Carolina.

12.     Defendant Donald E. Graham is the "Lead Independent Director."  Mr. Graham has served as the Chief Executive Officer of The Washington Post Company, an education and media company, since 1991 and as Chairman of its board of directors since 1993. Mr. Graham is a resident of the District of Columbia.

13.     Defendant Reed Hastings has been a director since June 2011.  Mr. Hastings has served as the Chief Executive Officer and Chairman of the board of directors of Netflix, Inc., a provider of an Internet subscription service for movies and television shows, since 1999.  Mr. Hastings is a resident of California.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

14.     By reason of their positions as officers and directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

15.     Each director and officer of the Company owes to Facebook and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company.

16.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Facebook, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their executive, managerial and directorial positions with Facebook, each of the Individual Defendants had access to adverse, non-public information about the unlawful conduct alleged herein.

17.   At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of Facebook, and was at all times acting within the course and scope of such agency.

18.   To discharge their duties, the officers and directors of Facebook were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Facebook were required to, among other things:

      a.  manage, conduct, supervise and direct the business affairs of Facebook in accordance with all applicable laws, rules, and regulations;

      b.  neither violate nor knowingly permit any officer, director or employee of Facebook to violate applicable laws, rules, and regulations;

      c.  neither engage in self-dealing nor knowingly permit any officer, director or employee of Facebook to engage in self-dealing;

      d.  ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

      e.  conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

      f.  properly and accurately guide investors and analysts regarding the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

g. preserve and enhance Facebook's reputation as a publicly-traded company, and to maintain public trust and confidence in Facebook as a prudently managed corporate entity fully capable of meeting its duties and obligations, including its public reporting obligations;

h. remain informed of how Facebook conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws and regulations.

19.    Each Individual Defendant, by virtue of his or her position as a director and officer, owed to the Company and its shareholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants alleged herein involves a violation of their obligations as directors and officers of Facebook, the absence of good faith on their part and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining Individual Defendants who collectively comprised Facebook's Board.

20.    The Individual Defendants breached their duties of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to misrepresent its financial results and prospects, as detailed herein, and by failing to prevent employees and/or officers of the company from taking such illegal actions.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

21.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their common plan or design. In addition to

the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

22.     In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

23.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct that caused the Company to conceal the true facts that Facebook was misrepresenting the adequacy of its internal controls and violating applicable laws.

24.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## SUSBSTANTIVE ALLEGATIONS

25.     On February 1, 2012, Facebook filed a Form S-1 registration statement with the SEC. Throughout the next several months, Facebook repeatedly amended the Form S-1.

26.     During the next several months, Facebook employees and underwriters involved in the IPO went on a "roadshow" whereby they had a series of meetings with potential investors. During these roadshows, no Facebook employee ever publicly issued any earnings guidance.

27.     On May 3, 2012, Facebook filed an amended Form S-1 indicating a maximum offering price of $35 per share and 388 million shares to be sold in the IPO.

28.     On May 9, 2012, Facebook issued an amended Form S-1 where it expressed caution about revenue growth due to a rapid shift by users to mobile devices (mobile advertising is generally less lucrative than advertising on desktop computers), stating as follows:

> Based upon our experience in the second quarter of 2012 to date, the trend we saw in the first quarter of DAUs increasing more rapidly than the increase in number of ads delivered has continued. We believe this trend is driven in part by

increased usage of Facebook on mobile devices where we have only recently begun showing an immaterial number of sponsored stories in News Feed, and in part due to certain pages having fewer ads per page as a result of product decisions.

29.     On May 15, 2012, General Motors announced that it was pulling its advertising business from Facebook, stating that Facebook ads were less effective than other forms of advertising.  This move by GM cost Facebook at least $10 million in annual revenue.

30.     Despite this negative news, that same day, Facebook raised its expected IPO price to $34-38 per share, from the previous expectation of $28-35 per share.  Facebook also increased the number of shares in the IPO from 388 million to 484.4 million shares.

31.     Facebook filed its final Form S-1 on May 16, 2012.

32.     On May 18, 2012, Facebook launched its IPO at a price of $38 per share.

33.     Only one day later, on May 19, 2012, Henry Blodget published an article on BusinessInsider.com titled "If This Really Happened During the Facebook IPO, Buyers Should Be Mad As Hell . . ."  The article disclosed rumors that Facebook not only selectively disseminated non-publicly disclosed earnings guidance to its underwriters, but is also subsequently lowered that guidance:

> Part way through the Facebook IPO roadshow, scattered reports appeared that Facebook had reduced the earnings guidance it was giving research analysts.
>
> This seemed bizarre on a number of levels.
>
> First, I was unaware that Facebook had ever issued any earnings guidance--to research analysts or anyone else.
>
> Earnings guidance is **highly material information** (meaning that any investor considering an investment decision would want to know it). It represents a future forecast made by the company. Any time any company gives any sort of forecast, stocks move--because the forecast offers a very well informed view of the future by those who have the most up-to-date information about a company's business.

So if Facebook had issued any sort of guidance, even quietly, this should have been made very public by the company and its bankers--especially because millions of individual investors were thinking of buying the stock.

Second, if Facebook really had "reduced guidance" mid-way through a series of meetings designed for the sole purpose of selling the stock this would have been **even more highly material information.**

Why?

Because such a late change in guidance would mean that Facebook's business was deteriorating rapidly--between the start of the roadshow and the middle of the roadshow.

Any time a business outlook deteriorates that rapidly, alarm bells start going off on Wall Street, and stocks plunge.

So the report that Facebook had "reduced earnings guidance" during the roadshow just seemed like a typical misunderstanding between Wall Street and the public--something lost in translation between what a reporter was hearing from sources and what actually made it into print.

But now Reuters has just reported the same thing again. Here's a sentence from a story Reuters just published on the IPO:

> Facebook also altered its guidance for research earnings last week, during the road show, a rare and disruptive move.

Hmmm.

If this really happened, anyone who placed an order for Facebook who was unaware that 1) Facebook had issued any sort of earnings guidance, and 2) reduced that guidance during the roadshow, has every right to be furious.

Because this would have been highly material information that some investors had and others didn't--the exact sort of unfair asymmetry that securities laws are designed to prevent.

[Emphasis in original.]

34.    On May 22, 2012, these fears were confirmed by a REUTERS Article titled "Insight: Morgan Stanley cut Facebook estimates just before IPO" which noted the unusual

nature of how, prior to the IPO, three underwriter banks (Morgan Stanley, JPMorgan Chase, and

Goldman Sachs) cut their estimates upon the issuance of a revised prospectus on May 9, 2012:

> In the run-up to Facebook's $16 billion IPO, Morgan Stanley, the lead underwriter on the deal, unexpectedly delivered some negative news to major clients: The bank's consumer Internet analyst, Scott Devitt, was reducing his revenue forecasts for the company.

> The sudden caution very close to Facebook's initial public offering - while an investor road show was under way - was a big shock to some, said two investors who were advised of the revised forecast.

> They said it might have contributed to the weak performance of Facebook shares, which sank on Monday and Tuesday - their second and third days of trading - to end more than 18 percent below the IPO price. The $38-per-share IPO price valued Facebook at $104 billion.

> Institutions and major clients generally enjoy quick access to investment bank research, while retail clients in many cases only get it later. It is unclear whether Morgan Stanley only told its top clients about the revised view or spread the word more broadly. The company declined to comment when asked who was told about the research.

> The change in Morgan Stanley's estimates came on the heels of a May 9 Facebook filing of an amended prospectus with the U.S. Securities and Exchange Commission, in which the company expressed caution about revenue growth due to a rapid shift by users to mobile devices. Mobile advertising to date has been less lucrative than advertising on desktops.

> "This was done during the road show - I've never seen that before in 10 years," said a source at a mutual fund firm who was among those called by Morgan Stanley.

> JPMorgan Chase and Goldman Sachs, which were also major underwriters on the IPO but had lesser roles than Morgan Stanley, also revised their estimates in response to Facebook's SEC filing, according to sources familiar with the situation.

> Morgan Stanley said in a statement that a "significant number" of analysts in the IPO syndicate reduced estimates after Facebook's May 9 disclosure. The investment bank said its procedures complied with all "applicable regulations."

> Devitt did not return phone messages seeking comment. JPMorgan and Goldman declined to comment.

Typically, the underwriter of an IPO wants to paint as positive a picture as possible for prospective investors. Investment bank analysts, on the other hand, are required to operate independently of the bankers and salesmen who are marketing stocks. That was stipulated in a settlement by major banks with regulators following a scandal over tainted stock research during the dot-com boom.

The people familiar with the revised Morgan Stanley projections said Devitt lowered his revenue estimate for the second quarter and also cut his full-year 2012 revenue forecast.

***

"That deceleration freaked a lot of people out," the investor added.

Scott Sweet, senior managing partner at the research firm IPO Boutique, said he was also aware of the reduced estimates.

"They definitely lowered their numbers and there was some concern about that," he said. "My biggest hedge fund client told me they lowered their numbers right around mid-road show."

That client, he said, still bought the issue but "flipped his IPO allocation and went short on the first day."

[Scott] Sweet said analysts at firms that are not underwriting IPOs often change forecasts at such times. However, he said it is unusual for analysts at lead underwriters to make such changes so close to an IPO.

"That would be very, very unusual for a book runner to do that," he said.

The lower revenue estimate came shortly before the IPO was priced at $38 a share, the high end of an already upwardly revised projected range of $34 to $38, and before Facebook increased the number of shares being sold by 25 percent.

"It's very rare to cut forecasts in the middle of the IPO process," said an official with a hedge fund firm who received a call from Morgan Stanley about the revision.

35.    On May 22, 2012, Henry Blodget published an article on BusinessInsider.com titled "Facebook Bankers Secretly Cut Facebook's Revenue Estimates in Middle of IPO Roadshow." The article explained that it was extraordinarily likely that Facebook secretly, and thus improperly, told underwriters to cut their estimates in light of new disclosures in the revised

prospectus, and that it was highly irregular that the three underwriter banks would cut their estimates unless it was explicitly suggested by Facebook. However, Blodget also noted that the key problem here was the subsequent "selective dissemination" of this nonpublic information to select institutional investors:

> But, just as important, news of the estimate cut was passed on only to a handful of big investor clients, not everyone else who was considering an investment in Facebook.
>
> This is a huge problem, for one big reason:
>
> - Selective dissemination. Earnings forecasts are material information, especially when they are prepared by analysts who have had privileged access to company management. As lead underwriters on the IPO, these analysts would have had much better information about the company than anyone else. So the fact that these analysts suddenly all cut their earnings forecasts at the same time, during the roadshow, and then this information was not passed on to the broader public, is a huge problem.
>
> Any investor considering an investment in Facebook would consider an estimate cut from the underwriters' analysts "material information."
>
> What's more, it's likely that news of these estimate cuts dampened interest in the IPO among those who heard about them. (Reuters reported exactly this--that some institutions were "freaked out" by the estimate cuts, as anyone would have been.)
>
> In other words, during the marketing of the Facebook IPO, investors who did not hear about these underwriter estimate cuts were placed at a meaningful and unfair information disadvantage. They did not know what a lot of other investors knew, and they suffered for it.
>
> Selective dissemination of this sort could be a direct violation of securities laws. Irrespective of its legality, it is also grossly unfair. The SEC should investigate this immediately.
>
> We first heard rumblings about this last week, and we were so startled that we assumed the reports were wrong. Then, over the weekend, when Reuters reported the basic story again, we said that if it was true, Facebook IPO buyers deserved to be "mad as hell" about it. And now Reuters has the details, and they sound as bad as we had feared.

36.    Later that day, Blodget published another article titled "EXCLUSIVE: Here's The Inside Story of What Happened On The Facebook IPO." In this article, he confirmed that a

Facebook executive verbally told underwriters about the lowered guidance; these underwriters in turn communicated this nonpublic information to select institutional investors:

> The appearance of [language in the revised prospectus concerning decreased ad business as a result of greater use of mobile devices] unnerved some sophisticated investors and analysts, who took it as a sign that Facebook's business might have deteriorated. The language was vague, however, and it did not make clear that Facebook's second quarter was weaker than expected. (To infer that message from the language, you had to know that Facebook's first quarter had been weak-- and that the cause had been the divergence between user growth and revenue growth.)

> Soon after Facebook amended its prospectus, all three analysts at the company's lead underwriters—Morgan Stanley, JP Morgan, and Goldman Sachs—cut their estimates for Facebook's Q2 and the full year.

> These estimate cuts were conveyed verbally to sophisticated institutional investors.

> And, not surprisingly, these investors viewed the estimate cuts as a startling and negative development.

> One important question, of course, was why all three underwriter analysts cut their estimates.

> Had they all read the new sentence in the prospectus above and realized that the second quarter was weak? Or had they been tipped off?

> It seemed inconceivable that all three analysts could have read the language above and concluded independently that Facebook's Q2 was weak and therefore decided to take the highly unusual step of cutting estimates in the middle of a company's IPO roadshow.

> More likely, it seemed, someone had directed the analysts to cut their estimates—most likely someone with inside knowledge of how Facebook's Q2 was progressing.

> And we have now heard from one source that that is what happened.

> **One of the underwriter's analysts has said he was told by a Facebook financial executive to cut his estimates.**

> According to another source with insight into the Facebook IPO process, until the underwriters' analysts cut their estimates, demand for Facebook's stock among

sophisticated institutional investors was high. Once these investors heard about the estimate cut, however, they became more cautious about the IPO.

(Again, an estimate cut like this during a roadshow would be hard to interpret as anything but negative. One institutional investor I spoke to said he has looked at more than 1,200 IPOs over the course of his career, and he has never heard of this before. This is especially true because the underwriter estimates aren't really "estimates"--they're more like company guidance.)

[Emphasis added.]

37.    In the article, Blodget further noted that while the negative earnings information, as communicated by the Facebook executive and the underwriters, scared off many of these institutional investors, and many institutional shareholders decided to sell more stock (rather than hold on to it), the price range and size of the deal was increased nonetheless:

The estimate cut, moreover, was followed by three additional pieces of information that were interpreted negatively by some institutional investors:

1)    The price range for the deal was increased, which made the deal even less attractive in light of the estimate cut,

2)    The size of the deal was increased, which meant that more stock would be sold, and

3)    Many smart institutional Facebook shareholders like Goldman Sachs decided to sell more stock on the deal—the "smart money," in other words, was cashing out.

Meanwhile, during private roadshow meetings, Facebook executives were reportedly "signalling" to some sophisticated investors that Facebook's advertising revenue would not grow as rapidly as some potential investors had hoped. Facebook's advertising business is driven primarily by company-to-company sales efforts, not by the self-serve ads that drive Google's business. Facebook executives reportedly made clear to sophisticated investors that this would limit the rate at which Facebook's ad business could grow.

By the second week of the roadshow, after the estimate cut and price increase, some institutional investors became more cautious about the IPO. According to one investor who looked at the deal, institutions "got the willies" and started to talk about paring back their stock orders.

38.     As Blodget explained in this article, while the institutional investors who learned of revised guidance had a lukewarm reaction to Facebook's IPO, the IPO was still in high demand from unwitting investors who were not privy to this nonpublic information. Accordingly, underwriters allocated an uncharacteristically high percentage of the IPO to individual investors:

> Meanwhile, out in the real world, demand for Facebook stock was hitting a fever pitch. One senior stockbroker at a major brokerage firm reported that he "had never seen such demand" for an IPO.

> These individual investors, needless to say, were not likely aware that the research analysts at the company's lead underwriters had cut their estimates for the company. They were also, presumably, unaware that Facebook's Q2 was weaker than expected.

> At the end of last week, the time came to decide on the IPO price for Facebook's stock.

> This process was handled by Facebook's lead underwriter, Morgan Stanley, and Facebook executives.

> According to one source (unconfirmed--this really is just scuttlebutt), based on the book of orders submitted by both institutional and retail investors, Morgan Stanley found that there were two distinct price levels at which investors were interested in buying stock.

> Institutional investors, having digested the news of the underwriter estimate cut, were comfortable buying Facebook stock at $32 a share.

> Retail investors, meanwhile, who were presumably unaware of the estimate cut, were comfortable buying Facebook at $40 a share.

> Knowing that a big percentage of the IPO stock could be sold to retail investors instead of institutional investors, Facebook and Morgan Stanley decided to price the IPO at $38.

> Although the precise allocations could not be learned, a source says that Morgan Stanley allocated a far larger percentage of the Facebook deal to individual investors than is normally the case in an IPO like this.

39.     Because a Facebook executive verbally conveyed material information to the underwriters that was not made public, and the underwriters conveyed such material information

only to select investors, Facebook potentially violated a number of rules and regulations. Furthermore, this conduct has become front page news that has placed Facebook and its management in a negative light, and has thus brought significant reputational harm to the Company.

40.     On May 22, 2012, it was also revealed that both the SEC and the Financial Industry Regulatory Authority ("FINRA") were investigating the selective dissemination of material information described above.  Furthermore, numerous class action lawsuits have been filed against Facebook for the conduct described above.

## DAMAGE TO FACEBOOK

41.     As a result of the Individual Defendants' conduct, Facebook has exposed itself to litigation and possible governmental or regulatory actions, and has thus exposed itself to millions of dollars, if not tens or hundreds of millions of dollars, in attorneys' fees, fines, and or litigation settlements.

42.     Furthermore the Individual Defendants' conduct has caused Facebook significant reputational harm.  As stated on Slate.com, in an article titled "One Reason for the Facebook IPO Mess: Zuckerberg Didn't Care":

> True, the company's earlier backers, who were able to unload more than $10 billion of stock at the highest possible price, may consider the deal worthy of high-fives and Cristal. **But the combination of a stock already trading well below its offer price, annoyed retail investors - many of them Facebook users - and regulatory probes constitutes a botched deal.** And that's without mentioning trading glitches, which were presumably beyond the company's control.
>
> There's also the impact on Facebook's reputation and morale. **Where the Silicon Valley titan was once viewed as a benign force connecting people, albeit with occasional privacy concerns, it now risks being synonymous with Wall Street money-grubbing. That's bad for a product dependent on consumers. It's also harmful for morale internally and, along with a listless stock price, for recruitment.**

[Emphasis added.]

16

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

43.     Plaintiff brings this action derivatively in the right and for the benefit of Facebook to redress injuries suffered, and to be suffered, by Facebook as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Facebook is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction in this Court that it would not otherwise have.

44.     Plaintiff will adequately and fairly represent the interests of Facebook and its shareholders in enforcing and prosecuting its rights.

45.     Plaintiff is the owner of Facebook common stock and was the owner of Facebook common stock at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

46.     At the time that this action was commenced, the Board consisted of the following directors: Defendants Mark E. Zuckerberg, James W. Breyer, Peter A. Thiel, Marc L. Andreessen, Erskine B. Bowles, Donald E. Graham, and Reed Hastings.

47.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants.  Such demand would be a futile and useless act with respect to each and every one of the Individual Defendants because they are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons:

48.     Defendant Zuckerberg is not an independent director because is currently serving as the Company's Chairman and CEO, and before the IPO was a 25% owner of Facebook. Immediately after the IPO, Zuckerberg sold 30.2 million shares for $1.1 billion, and thus had an interest in keeping the IPO price artificially inflated.   Accordingly, Zuckerberg is not disinterested and cannot fairly evaluate a demand.

49.     Defendant Breyer is a partner at Accel Partners.  In May 2005, Breyer invested $12.7 million in Facebook for a 10.7% ownership stake, and Breyer himself invested an

17

additional $1 million.   Accel and Breyer unloaded 49 million shares in connection with the offering, and thus had an interest in keeping the IPO price artificially inflated.  Accordingly, Breyer is not disinterested and cannot fairly evaluate a demand.

50.     Defendant Thiel was an early Facebook investor through his Founders Fund venture capital firm, and before the IPO had a 3% stake in Facebook.  Immediately after the IPO, Thiel sold $16.8 million shares for $633 million, and thus had an interest in keeping the IPO price artificially inflated.  Accordingly, Thiel is not disinterested and cannot fairly evaluate a demand.

51.     Defendant Bowles sits on the board of Morgan Stanley, the lead underwriter that improperly and selectively disseminated nonpublic information it received from a Facebook executive. As a result, Morgan Stanley is subject to litigation and regulatory and governmental investigations.  Bowles cannot be expected to take any action, on behalf of Facebook, that would harm Morgan Stanley.  Accordingly, Bowles is not disinterested and cannot fairly evaluate a demand.

52.     Defendant Andreessen is conflicted because he is co-founder of venture capital firm Andreessen Horowitz, which had a significant private investment in Facebook before it went public.  Andreessen Horowitz also made $78 million from a $250,000 seed investment in Instagram, a company that was recently acquired by Facebook for $1 billion.  The FTC is reportedly investigating this acquisition.  Accordingly, Andreessen is not disinterested and cannot fairly evaluate a demand.

53.     Defendant Graham is the CEO of The Washington Post Company.  THE WASHINGTON POST is a major advertiser with Facebook,: from 2009 through 2011, The Washington Post spent $9.6 million on Facebook ads.  THE WASHINGTON POST is also affiliated with SocialCode, an ad agency whose clients do business with Facebook.  Accordingly, Graham is not disinterested and cannot fairly evaluate a demand.

54.     Defendant Hastings is CEO of Netflix.  Netflix is a major advertiser with Facebook: from 2009 through 2011, Netflix spent $7.3 million on Facebook ads.  Accordingly, Hastings is not disinterested and cannot fairly evaluate a demand.

55.     Furthermore, Defendant Zuckerberg is on the nominating committee, the committee that determines the composition of the board.  Because Zuckerberg is on this committee, he has significant control of the composition of the board, and can either entrench the current members that act in accordance with his wishes, or appoint new members to do his bidding.  For this reason as well, the whole board is not disinterested and cannot fairly evaluate a demand.

56.     Furthermore, each Individual Defendant signed, or directed their signature, on the registration statements at issue.  For this reason as well, the whole board is not disinterested and cannot fairly evaluate a demand.

57.     In fact, an article on THE WALL STREET JOURNAL'S blog, titled "Facebook Board Raises Eyebrows," dated February 2, 2012, quoted Columbia Law School Professor John Coffee as saying  that "[p]retending that Facebook will have an independent board . . .  is like putting rouge on a corpse."  He stated that Facebook's board has made "a brazen insistence that they are not going to let Wall Street impose their rules" concerning the seating of a truly independent board.

## COUNT I

## (AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY)

58.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

59.     The Individual Defendants owed a fiduciary duty to Facebook to supervise the issuance of the news concerning the company's financial condition or prospects, and ensure that such issuance was not done in violation of applicable laws or regulations. Additionally, by

reason of their positions as directors, officers and controlling shareholders of Facebook, the Individual Defendants owed Facebook and its stockholders fiduciary duties of care, loyalty, candor, good faith and fair dealing.

60.    As fiduciaries, to discharge these duties, the Individual Defendants were required to exercise prudent supervision over management, policies, practices, controls, and financial and corporate affairs of Facebook.

61.    The Individual Defendants, however, breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Facebook's internal controls and by allowing the Company to issue material financial information only to select entities, in violation of applicable laws or regulations.

62.    Defendants have engaged in a sustained and systematic failure to exercise their oversight responsibilities and to ensure that Facebook complied with applicable laws, rules, and regulations.

63.    As members of the Board, the Individual Defendants were directly responsible for authorizing, permitting the authorization of, or failing to monitor the practices that resulted in violations of applicable laws as alleged herein.  Each of them had knowledge of and actively participated in, approved, and/or acquiesced in the wrongdoing alleged herein or abdicated his or her responsibilities with respect to this wrongdoing.  The alleged acts of wrongdoing have subjected the Company to unreasonable risks of loss and expenses.

64.    Each of Defendants' acts in causing or permitting the Company to disseminate material misrepresentations and omissions to the investing public and abdicating his or her oversight responsibilities to the Company have subjected the Company to liability for violations of applicable laws and regulations, and therefore were not the product of a valid exercise of

business judgment.  Rather their acts constituted a complete abdication of their duties as officers and/or directors of the Company.  As a result of Defendants' breaches, the Company's reputation in the business community and financial markets has been irreparably tarnished.

## COUNT II

### (AGAINST THE INDIVIDUAL DEFENDANTS FOR GROSS MISMANGEMENT)

65.      Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

66.      Defendants had a duty to Facebook and its shareholders to prudently supervise, manage, and control the operations, business, and internal financial accounting and disclosures of the Company.  Defendants, however, by their actions and by engaging in the wrongdoing alleged herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of Facebook in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence, and candor in the management and administration of Facebook's affairs.

67.      During the course of the discharge of their duties, Defendants were aware of the unreasonable risks and losses associated with their misconduct.   Nevertheless, Defendants caused Facebook to engage in the scheme described herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties to the Company.  As a result, Defendants grossly mismanaged Facebook, thereby causing damage to the Company.

## COUNT III

### (AGAINST THE INDIVIDUAL DEFENDANTS FOR CONTRIBUTION AND INDEMIFICATION)

68.      Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

69.    Facebook is alleged to be liable to various persons, entities and/or classes by virtue of the facts alleged herein that give rise to Defendants' liability to the Company.

70.    Facebook's alleged liability on account of the wrongful acts, practices, and related misconduct alleged arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of Defendants, and the Company is entitled to contribution and indemnification from each defendant in connection with all such claims that have been, are, or may in the future be asserted against Facebook, by virtue of the Individual Defendants' misconduct.

## COUNT IV

### (AGAINST THE INDIVIDUAL DEFENDANTS FOR ABUSE OF CONTROL)

71.    Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

72.    The Individual Defendants' conduct, as alleged herein, constituted an abuse of their control over Facebook.

73.    As a direct and proximate result of the Individual Defendants' abuse of control, the Company has suffered, and will continue to suffer, damages for which the Individual Defendants are liable. Plaintiff, moreover, has no adequate remedy at law.

## COUNT V

### (AGAINST THE INDIVIDUAL DEFENDANTS FOR WASTE OF CORPORATE ASSETS)

74.    Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

75.     The Individual Defendants' conduct, as alleged herein, constituted a waste of the corporate assets of Facebook.

76.     As a direct and proximate result of the Individual Defendants' abuse of control, the Company has suffered, and will continue to suffer, damages for which the Individual Defendants are liable.  Plaintiff, moreover, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

a.     Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

b.     For an order setting an emergency shareholder vote date for election of new directors;

c.     Directing Facebook to take all necessary actions to reform and improve its corporate governance and internal control procedures so that they comply with relevant laws;

d.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

e.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  May 24, 2012

MURRAY FRANK LLP

By:_____
Brian P. Murray (BM 9954)
bmurray@murrayfrank.com
Gregory B. Linkh (GL 0477)
glinkh@murrayfrank.com
275 Madison Avenue, Suite 801
New York, New York 10016
Telephone:    (212) 682-1818
Facsimile:    (212) 682-1892

*Counsel for Plaintiff Edward Childs*

I, Edward Childs, do hereby depose and say on this ~~1st day of July, 2011~~ 24th day of May, 2012, in the State of Pennsylvania, Allegheny County that:

1.   I am and have been the holder of the common stock of Facebook, Inc. continuously since prior to the wrongs complained of.

2.   I have read the Complaint to be filed in the above-captioned action.

3.   The facts alleged in the Complaint are true and correct to the best of my knowledge, information and belief.

4.   I have not received, been promised or offered, and will not accept, any form of compensation, directly or indirectly, for prosecuting or serving as a representative party in this class action except for:

A.   such damages or other relief as the Court may award me as a member of the class;

B.   such fees, costs or other payments as the Court expressly approves to be paid to or on behalf of Plaintiff; or reimbursement, paid by Plaintiff's attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

Edward Childs

By: _____